F77FKNEA

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  OFFICE SPACE SOLUTIONS,

4              Plaintiff,

5          v.                          15 CV 4941 (LAK)

6  JASON KNEEN,

7              Defendant.

8  ------------------------------x
                                      New York, N.Y.
9                                     July 7, 2011
                                      11:00 a.m.
10
   Before:
11
                   HON. LEWIS A. KAPLAN,
12
                                      District Judge
13
                       APPEARANCES
14
   THE BOSTANY LAW FIRM
15      Attorneys for Plaintiff
   JOHN BOSTANY, ESQ.
16 ROMAN POPOV, ESQ.

17 KAREN J. BERNSTEIN, ESQ.
       Attorney for Defendant
18

19 JOHN BERRYHILL, ESQ.
       Attorney for Defendant
20

21

22

23

24

25

F77FKNEA

```
 1              (Case called)

 2              (In open court)

 3              THE DEPUTY CLERK:  Office Space Solutions v. Jason

 4     Kneen.  Plaintiff, are you ready?

 5              MR. BOSTANY:  Yes.  John Bostany and Roman Popov for

 6     the plaintiff.

 7              MS. BERNSTEIN:  Good morning, Judge Kaplan.  My name

 8     is Karen Bernstein.  I'm an attorney for the defendant Jason

 9     Kneen.  I'd like to introduce my colleague, Dr. John Berryhill.

10     Dr. Berryhill is an attorney admitted in good standing in the

11     Commonwealth of Pennsylvania and by oral motion I am requesting

12     he be admitted pro hac vice.

13              THE COURT:  I will not do that on oral motion.  You

14     have to file papers.  You have to pay a fee.  Is he arguing?

15              MS. BERNSTEIN:  He is arguing the opposition to the

16     motion.  We were only given a few days to respond and it was

17     difficult from an administrative point to get the

18     certification.

19              THE COURT:  The idea is if you will argue -- of what

20     are you a doctor, sir?

21              MR. BERRYHILL:  Electrical engineering before becoming

22     a JD.

23              THE COURT:  In what area are you admitted?

24              MR. BOSTANY:  Pennsylvania, sir.  I've been admitted

25     pro hac vice here before.
```

F77FKNEA

1          THE COURT:  I'll hear you, but you have to file papers

2     and pay a fee.

3          MR. BERRYHILL:  Yes, your Honor.

4          THE COURT:  Okay.  Go ahead, Mr. Bostany, and use the

5     lectern, please.

6          MR. BOSTANY:  Thank you, Judge.  We're here today on a

7     very serious case but a very interesting legal issue, that has

8     not been, as far as I could tell, before another one of your

9     colleagues here at the Southern District or in the Second

10    Circuit.  It has been, at least in theory, the philosophical

11    point of view of moving away from the strict requirement that

12    the time in question be the registration initially --

13         THE COURT:  Let's back up, because I don't think I

14    have to reach that question in this case.  Problem number one

15    is that I do not understand for the life of me how you have any

16    likelihood of success on the issue of personal jurisdiction.

17    Problem number two is that I do not understand how you've

18    established any cognizable threat of irreparable injury.  And I

19    could go on.  But that's for starters.

20         MR. BOSTANY:  Well, your Honor, let me just back up,

21    then.  As your Honor suggested.  The order to show cause that

22    we're asking be turned into a preliminary injunction is for one

23    thing and one thing only.  It's to prevent the WorkBetter.com

24    domain to be transferred while this case is pending.

25         THE COURT:  Let me ask you a preliminary question.  Is

F77FKNEA

```
1    there some exception for personal jurisdiction for cases that
2    are asking for just standstill relief?
3              MR. BOSTANY:  No, that's why when your Honor mentioned
4    that, I was a little bit upset that I didn't start with that.
5    Because your Honor I know from prior cases is very focused on
6    jurisdiction, as it should be, and I was now about to get to
7    that, and that is actually my weakest argument.  But I don't --
8              THE COURT:  I agree with you.
9              MR. BOSTANY:  So, you know, the cases I cited in my
10   opening brief, Judge, I tried for the life of me to find better
11   cases and I couldn't.  I have that one case, that NFL case and
12   the Cello case and those are the only cases that I find that
13   come close to this fact pattern where you have an international
14   businessman like the defendant.
15             THE COURT:  What makes you think he's an international
16   businessman?  Is there any evidence of that at all?
17             MR. BOSTANY:  It hasn't been disputed and it's because
18   the exhibits we've attached to our moving papers --
19             THE COURT:  I'm sorry, it also hasn't been disputed
20   that the Dodgers won the 1959 World Series, but that doesn't
21   mean I can conclude --
22             MR. BOSTANY:  Let me tell you why I think we've
23   established in a prima facie case why he does international
24   business.  I think the statute says he has to be involved in
25   interstate or international commerce.
```

F77FKNEA

| | |
|---|---|
| 1 | THE COURT:  That's not what it says. |
| 2 | MR. BOSTANY:  Something along those lines.  And I |
| 3 | believe we've indicated that he says on his website that he -- |
| 4 | let me just find it, Judge, because I don't want to summarize |
| 5 | what the defendant says.  He says, it's in paragraph 7 of the |
| 6 | Khan declaration, we quote from the defendants.  "I work for |
| 7 | clients in the U.K., U.S.A., I am a speaker on mobile |
| 8 | development and I'm currently authoring two books on titanium." |
| 9 | THE COURT:  So it's the titanium you're hanging your |
| 10 | hat on, is that right? |
| 11 | MR. BOSTANY:  I would say the authoring of two books. |
| 12 | I mean, you know -- |
| 13 | THE COURT:  So Dostoyevsky would have been subject to |
| 14 | jurisdiction? |
| 15 | MR. BOSTANY:  Today?  I think so. |
| 16 | THE COURT:  Well, I'm not sure whether that's a crime, |
| 17 | but I'm thinking about the punishment. |
| 18 | MR. BOSTANY:  He develops apps for all Fortune 500 |
| 19 | companies.  Not all, but some; Microsoft, Disney, Bed, Bath and |
| 20 | Beyond. |
| 21 | THE COURT:  But what about the rest of the statute? |
| 22 | Even if he does some transnational business.  You're relying on |
| 23 | CPLR 302(a)(3)(ii), right? |
| 24 | MR. BOSTANY:  Yes, sir. |
| 25 | THE COURT:  It says even if you meet all the other |

F77FKNEA

1    criteria in the statute of which deriving revenue from foreign

2    commerce is but one.  The statute confers only specific

3    jurisdiction, that is to say, only jurisdiction with respect to

4    claims that arise from acts enumerated in the remainder of the

5    statute.  Now, how does your claim arise from whatever he did

6    for some Fortune 500 company?

7            MR. BOSTANY:  Well, it has to have, the second part of

8    the statute under .ii requires that the acts of the defendant

9    have consequences in the state.

10           THE COURT:  Well, okay.  How have you proved that?

11           MR. BOSTANY:  We believe, and, again, this is, the

12   Cello case is the closest we came, is that defendant must have

13   known when he was communicating with the --

14           THE COURT:  What about those communications told the

15   defendant that your client was in New York and not in Chechnya?

16   Anything in there?

17           MR. BOSTANY:  There were LinkedIn communications and

18   my client's LinkedIn profile indicates he works in New York and

19   he resides in New York.

20           THE COURT:  Well, is there any evidence in this record

21   of what a LinkedIn communication is, what a LinkedIn profile

22   is?

23           MR. BOSTANY:  No.

24           THE COURT:  Whether somebody who went on LinkedIn and

25   got a communication from your client through LinkedIn would

F77FKNEA

1   have seen the profile?  Nothing; right?

2          MR. BOSTANY:  Nothing.  My argument now, I would just

3   be talking to you about things that are not in the record and I

4   know your Honor doesn't like that very much.

5          THE COURT:  It's not that I don't like it.

6          MR. BOSTANY:  Well, no one would.

7          THE COURT:  It's that the Supreme Court of the United

8   States says I can't rely on that stuff.

9          MR. BOSTANY:  Right.  So I don't want to -- what my

10  argument would move to, because your Honor focused on something

11  that none of us, which is the issue --

12         THE COURT:  You both did.  You both did.  You said

13  there's jurisdiction in your memorandum, but you put in no

14  evidence and other than citing 302(a)(2) and coming up with

15  this theory that he's some international operation, you said

16  nothing about it, cited no evidence -- well, I guess you cited

17  a case, and the other side made an issue of it.  And you didn't

18  even respond to it.

19         MR. BOSTANY:  Well, the other side's argument was how

20  were we supposed to know, the defendant was not supposed to

21  know that these two communications with a New York resident

22  would rise to the level of having consequences to the state.

23  They didn't focus on -- your issue is much better, obviously,

24  because now I don't have a reply to your issue but I had a

25  reply to their issue.  I'm not saying the Court is not allowed

F77FKNEA

1    to bring it up by any means.  You could dismiss this case and

2    give us -- I don't know what the -- I forget what the procedure

3    is because the last case I had dismissed for this issue is

4    before you, Judge Kaplan, and you let me file it again here.

5    But this, I don't know if you would allow me to cure or if we

6    go to, if we have the time to file in rem in Washington State,

7    but if you could give me a few days to do either of those.

8             THE COURT:  You don't need a few days to file in

9    Washington State.  Last I heard their courts were still open.

10            MR. BOSTANY:  Yes, I could do it --

11            THE COURT:  What you have is a fully submitted motion,

12   or you will as soon as everybody sits down, for a preliminary

13   injunction which I'm going to rule on today.  We're not having

14   a do-over.

15            MR. BOSTANY:  In other words, are you going to dismiss

16   the case or rule on the preliminary injunction?

17            THE COURT:  I'm just going to rule what's before me.

18            MR. BOSTANY:  Okay, then let me get to the other

19   aspects of it.  Could I get to --

20            THE COURT:  Sure.  By all means.

21            MR. BOSTANY:  Judge, the other two aspects of a

22   preliminary injunction are likelihood of success and

23   irreparable injury.  We believe we could show likelihood of

24   success and have shown likelihood of success by putting cases

25   in our motion that talk to the policy reasons behind the

F77FKNEA

```
1    anticybersquatting act, which is to prevent warehousing, Judge.
2    There's no doubt the defendant is a warehouser.
3              THE COURT:  Sure he is.
4              MR. BOSTANY:  He argues in his papers he's not --
5              THE COURT:  Sure there is.  There's an issue.  He
6    disputes it.  He says not true.
7              MR. BOSTANY:  Judge, if you look at his papers he
8    doesn't even recognize that he has listed over a hundred names
9    for resale.  He tries to tell you he's only got a few names.
10             THE COURT:  No, he doesn't say that at all.
11             MR. BOSTANY:  I quoted his paragraphs, Judge.
12             THE COURT:  Well, if that's what you quoted, you
13   didn't quote it accurately.  That's not what he says.  It's
14   always a good idea to read the papers.
15             MR. BOSTANY:  He says --
16             THE COURT:  He says that over the years he's had
17   inquiries, a number of inquiries.  He doesn't say how many
18   inquiries, but he says only twice has he ever sold anything.
19   Twice in at least 17 years.  16 years.
20             MR. BOSTANY:  And this is primarily the reason why the
21   legislators have said many cybersquatters are now careful to no
22   longer offer the domain for sale in any manner that could
23   implicate liability under existing trademark dilution case law.
24   We're talking about a sophisticated business person that's
25   extremely intelligent.
```

F77FKNEA

1          THE COURT:  Somebody who you say is in the business of

2     selling domain names but has managed in 17 years to sell two.

3          MR. BOSTANY:  Right.  He's managed to do -- escape

4     the -- in his mind he's doing exactly what he's getting you to

5     do today, which is to leave him alone so that when someone does

6     develop an interest in these names that he's not using in any

7     way whatsoever other than warehousing, they will develop an

8     interest in them enough to pay him a huge amount.  Not $500,

9     not a thousand dollars.  Who knows?  We asked him what kind of

10    counter offer and he said I don't even want to say it right

11    now, I want to wait.

12         THE COURT:  Let's be practical, Mr. Bostany.  What

13    went on here is you were trying to set him up.  Your client was

14    trying to set him up.

15         MR. BOSTANY:  Your Honor, my client's last

16    communication was, that was not responded to, please tell us

17    any amount that you would take and he didn't reply to that.

18         THE COURT:  I read it.

19         MR. BOSTANY:  That was in May 2015.

20         THE COURT:  And that's a good faith attempt to profit

21    from it, right?  The guy says tell me what I have to pay you to

22    buy this domain name and the response of the man who supposedly

23    in bad faith is trying to profit from your guy's trademark is

24    not interested.  Not even interested enough to respond.

25         MR. BOSTANY:  Because his prior response was I'd like

F77FKNEA

1    to wait it out.  I see another company developing interest in

2    this name.  It's consistent with his whole plan and his whole

3    philosophy -- why else is he holding over a hundred domains and

4    putting on his website that they're for sale if he doesn't want

5    to profit from them?  Why isn't he saying to the guy that is

6    offering him $500 no, and not responding, "I see other people

7    that may pay me more," because he wants to profit?  There is no

8    other reason.  He doesn't say in there it's not for sale, I

9    want to use it myself.  He says it's not for sale because

10   another large company may want it and pay me more.  This is

11   exactly what the anticybersquatting law says he's not allowed

12   to do and what other judges have said in, not a case on all

13   fours, I'm not saying that the Judge Holwell case is a case on

14   point, but the theory there is when someone is asking for

15   exorbitantly more money than the actual cost of the domain

16   name, that is extremely important proof of the fact that this

17   person wants to profit and there's nothing in the factual

18   statements that are in the record that the defendant has said

19   that indicate that he was just warehousing over a hundred names

20   so that he could use them for personal use.

21        I know it's in his argument, but this Court is

22   extremely sharp.  I've been before this Court many times and I

23   don't have to say much more.  I really don't, Judge.  I think

24   that if you look at this and you say, okay, you're warehousing

25   over a hundred domain names, you have them on your website for

F77FKNEA

1    sale and you're saying to the plaintiff that's offering you a

2    thousand dollars, no, not right now, there's another company

3    that's using this name, it's not hard for me to connect the

4    dots and say that you obviously are looking to profit by these

5    names and not using them yourself.  Have you used any of them

6    yourself in the past 16 years?

7              THE COURT:  Just remind me of when the cybersquatting

8    act was enacted?

9              MR. BOSTANY:  1999.

10             THE COURT:  Thank you.  Anything else?

11             MR. BOSTANY:  That's it, Judge.

12             THE COURT:  All right.  Mr. Berryhill?  Dr. Berryhill?

13             MR. BERRYHILL:  Thank you, your Honor.  I'd like to

14   address the cognizable threat first to explain how this

15   application that we're arguing today -- we're not here on a

16   dismissal of the case.  The case hasn't been served.  The only

17   thing that was served was the TRO and this application.

18             On the issue of the cognizable threat, there is as a

19   condition of being an internet domain name registrar, every

20   registrar must include mandated terms in their registration

21   agreement and the registrar in this instance, eNom in

22   Washington State, incorporates into the registration contract

23   the basis of the domain name a dispute policy.  With the

24   Court's permission could I provide a copy to counsel and to the

25   Court?

F77FKNEA

1          THE COURT:  Well, this is something else that you're

2     bringing in that's not in the record, right?

3          MR. BERRYHILL:  Well, it's in the record in a sideways

4     way.  The Goforit case, which I cited in my brief.

5          THE COURT:  In other words, I can rely on evidence

6     that was offered in other cases?

7          MR. BERRYHILL:  No.  It describes a procedure by which

8     if a domain registrar is made aware of any registration

9     respecting the domain name they are required to lock the domain

10    name and they're required not to transfer the domain name

11    simply as a consequence of the litigation being filed.  The

12    ordinary procedure in ACPA cases is the plaintiff files the

13    complaint, takes a Court-stamped copy of the filed complaint

14    and just mails it to the registrar and they'll actually prevent

15    transfer of the domain name.  So as long as this case is

16    pending eNom will not allow transfer of the domain name as a

17    practical matter.

18         THE COURT:  Mr. Bostany, I know it's outside the

19    record, but do you dispute this?

20         MR. BOSTANY:  Your Honor, we had a conference to try

21    to resolve this last night and it was not brought up.  If it

22    had been brought up I would have looked into it and we would

23    not have needed to be here today.

24         MR. BERRYHILL:  I don't make eNom's policy, but that's

25    what happened in the Goforit case.  The registrar in that

F77FKNEA

1    case -- it was a case in the Northern District of Texas.  The

2    registrar was in Canada but they received a letter of here's a

3    copy of the complaint we filed and all the defendant's domain

4    names were locked.  As it turned out in that case the

5    plaintiff's complaint had no merit and on counterclaims for

6    damage of tortious interference of contract the plaintiff was

7    found liable.

8            On the issue of personal jurisdiction, that's I think

9    been pretty well discussed already.  I would point out that the

10   communications on which the plaintiff is relying were

11   communications initiated by the plaintiff prior to any claim of

12   trademark rights, in fact, before the trademark application was

13   even filed, so you had this U.S. non-trademark owner contacting

14   a U.K. non-trademark owner saying, you know, I'm interested in

15   this descriptive phrase.

16           And there is no contrary -- there is a lot of

17   discussion of warehousing.  There's no mention of warehousing

18   in the statute.  The statute requires a specific bad faith

19   intent to profit on the basis of someone's trademark, where the

20   trademark is distinctive at a time a domain name is registered.

21   Those are the plain words of the statute, without going to

22   other concerns that people had at the time, trading in domain

23   names, profiting in the descriptive domain names was not

24   unlawful.  In the first Cello case in 2000 in the Southern

25   District the Court said there's a difference between somebody

F77FKNEA

registering something like Apple Computer and trying to sell it
to Apple Computer versus registering "apple" and trying to sell
that, which may go to an apple farmer up the Hudson River.

        Lawyer.com is a trade name we all can appreciate,
Martindale Hubbel brought that for a large amount because they
couldn't develop trademark rights.  Merely having a domain
name -- these were primarily registered because he's an
application developer --

        THE COURT:  There would be a pretty good argument,
wouldn't there, that WorkBetter, in the absence of, at least in
the absence of heavy evidence of secondary meaning would be, if
it were litigated, held an invalid mark.

        MR. BERRYHILL:  In fact, in our papers -- we have a
copy of what the plaintiff purports to be the website through
which it conducts business and it says, "We've got things
coming soon," and, "We're here to help people work better."
The plaintiff itself in its non-trading website, you cannot
conduct commerce with the plaintiff through that website.  They
still don't conduct commerce.  In fact, the plaintiff's
principal tweeted three days ago that he's looking for a PR
firm in New York to help launch Work Better.

        Your Honor's comments to the fact that this was sort
of a setup are very insightful because this has become
something of a pattern that a lot of domain names are
registered -- there's like 110 million domain names registered

F77FKNEA

```
 1    to dot com and it's a truism that all the good ones are taken.
 2    The defendant is an application developer, he registered Work
 3    Harder, Work Better, Work Faster, Work Easier, because he
 4    thought they might come in handy some day.  And in the meantime
 5    he directed them to his personal blog.  In all of the arguments
 6    the plaintiff advanced that the names are unused, in the
 7    communication from plaintiff's principal on September 23 he
 8    said I am interested in this domain name that you are using to
 9    forward to your personal blog.  Defendant was not conducting,
10    transacting business in the United States through that blog.
11    It's just his personal blog.  It is not an interactive website
12    where you can trade.  Of course, neither is the plaintiff's
13    website Work Better U.S.  There's no business being transacted
14    there.
15             There are some suspicious statements in how the papers
16    in the case versus the actual correspondence between the
17    parties are at variance.  The plaintiff's principal has a
18    declaration to the effect that communication occurred after he
19    did file his trademark application when in fact the plaintiff
20    initiated that communication.  And to say that if I initiate a
21    communication with someone anywhere in the world and they
22    answer me that drags them into the State of New York is a
23    little far-fetched.
24             The plaintiff is not left without a forum.  The ACPA
25    provides in rem jurisdiction where the registry and registrar
```

F77FKNEA

1    is located.  The registry in this case is located in Virginia.

2    VeriSign runs it.  The ACPA has a lot of experience with in rem

3    cases that's required as protection against lack of

4    jurisdiction over the defendant.  The domain registration

5    contract is with an entity in Washington State.  That domain

6    registration contract has an incorporated dispute policy and,

7    finally, the dispute policy incorporates an administrative

8    arbitration procedure that anyone can file.  It's conducted by

9    the Worldwide Neutral Property Organization that's empowered to

10   adjudicate these kinds of disputes.

11        So there's three alternative avenues for the plaintiff

12   to proceed with other than seeking jurisdiction in this court.

13        THE COURT:  Okay, thank you.  Mr. Bostany, briefly?

14        MR. BOSTANY:  Your Honor, I was about to say that

15   based upon Dr. Berryhill's representation that eNom freezes it

16   any way that we'd like to withdraw this motion and I would like

17   to do that and I would like to withdraw the motion.  I believe

18   you, Dr. Berryhill, I've spoken to you before and I have good

19   intuition about people's character and I don't think you are

20   misrepresenting.  I'd like to withdraw and I'd like to withdraw

21   the entire case based upon the Court's comments about

22   jurisdiction, but I don't think I'd like to do this right now.

23        THE COURT:  I think, having come this far, as long as

24   the action is before me I'm going to rule on the motion.

25        This is an action under the anticybersquatting act.

F77FKNEA

1    The plaintiff, known as Office Space Solutions, which appears

2    actually to be a man named Mr. Mehta, has a registered

3    trademark which it obtained from the Patent Office earlier this

4    year into the word mark "WorkBetter."  It brings the action

5    against a gentleman named Jason Kneen, who is a British

6    national resident in the United Kingdom who develops web and

7    personal computer software.  Mr. Kneen has had a registered

8    domain name for the URL WorkBetter.com since 1999.  The only

9    evidence of contacts by Mr. Kneen with the United States as

10   distinguished from rhetoric is consistent only with a

11   conclusion that they are de minimis.  As I mentioned, Mr. Kneen

12   in February of 1999 registered not only the domain name

13   WorkBetter.com but also WorkHarder.com and WorkFaster.com as

14   well as possibly another in the belief that they might be

15   useful in connection with work management or productive

16   software which are among the things he develops but might not

17   be available later if you fail to register those domain names.

18        Oh, I should add that he has kept the registration in

19   force ever since by automatic payment of annual fees to the

20   registrar, which occur because he gave the registrar his credit

21   card number and the registrar charges the fee to Mr. Kneen's

22   credit card every year without any volitional action on the

23   part of Mr. Kneen.  I do assume that he pays the bills, but

24   other than that, there's no evidence of additional action.

25        The plaintiff's brief asserts that Mr. Kneen, and I

F77FKNEA

quote, "reregistered/updated," close quote, the registration in

February of this year.  That's in their memorandum, docket item

10 at page 5.  The plaintiff, however, has submitted no

evidence at all to support that assertion.  Mr. Kneen's

memorandum says that he didn't update or reregister the domain

names in February of 2015, but he hasn't submitted direct

evidence on that point either.  The most that can be said is

that Mr. Kneen's declaration says that he has the arrangement

with the registrar since 1999 that I described that relates to

the payment of the annual fee.  That is supported by evidence.

In those circumstances I specifically decline to find that

Mr. Kneen reregistered or updated the domain name registration

at any time since 1999 except to whatever extent one might

regard the payment of the annual fee as falling within that

phrase.

        The plaintiff also raises some question as to whether

Mr. Kneen, who describes himself as a developer of web and

portable computer software, is in the business also of selling

domain names.  The complaint says he's a reseller of domain

names three times.  The plaintiff asserts without

contradiction, although I'm not sure there is any evidence of

this, that Mr. Kneen has a hundred domain names listed as being

for sale on one of his websites.  Mr. Kneen denies that he's in

the business of registering domain names for resale.  He says,

without contradiction but under oath, that although he's been

F77FKNEA

1   approached many times by others over the years with inquiries

2   to purchase domain names he has sold only two, one in 2004 and

3   the other in 2008.  I'm not totally sure that it really matters

4   whether his activities are characterized as engaging in the

5   business of selling domain names, but if it matters he

6   certainly doesn't do it with any great success.

7          It's worth describing the course of dealing between

8   the parties.  It began on April 23rd, 2004 when Mr. Mehta

9   initiated contact with Mr. Kneen.  He said in substance that he

10  was working on a new project.  He wanted to use the domain name

11  WorkBetter.com and asked Mr. Kneen to give him a price at which

12  he'd sell it.  Two days later, two days, without any

13  communication of the fact to Mr. Kneen, Mr. Mehta caused an

14  application to be made to the Patent and Trademark Office to

15  register the work mark WorkBetter under 15 U.S.C. 1015(b) on an

16  intent to use basis.  Mr. Mehta swore under penalties of

17  perjury that he had, quote, a bona fide intention to use the

18  mark in commerce or in connection with the goods/services, and

19  I am interpolating the word "described" into the quotation, in

20  the application, close quote.

21         Three days went by.  No response from Mr. Kneen so Mr.

22  Mehta pinged him again electronically.  Five days after that

23  Mr. Kneen responded, May 14, 2013, the salient part of the

24  response to Mr. Mehta being make me an offer.  Mr. Mehta

25  responded suggesting $500.  Kneen said he wasn't interested.

F77FKNEA

1    Mehta then solicited a response at which Mr. Kneen would sell.

2    Kneen responded that he thought the number he'd want would be

3    too high.  He assumed that Mr. Mehta wouldn't be interested.

4    He indicated that he heard that Citrix, I believe it was, was

5    developing something that either would or might suggest an

6    interest in this domain name, but he basically turned off the

7    inquiry from Mr. Mehta.  Mr. Mehta was not to be deterred.  On

8    May 16, 2014 he again solicited a price from Mr. Kneen.

9    Mr. Kneen ignored the communication.

10         Now, it's interesting that although on April 25, 2014

11   Mr. Mehta had caused the trademark application to be filed.  He

12   never informed Mr. Kneen of the trademark registration

13   application, he never referred to having a trademark in Work

14   Better or any variant of it.  He was totally silent on that.

15   Then on June 24 the plaintiff's director of technology

16   initiated a transfer of the domain name WorkBetter.com from

17   Mr. Kneen to the plaintiff.  Mr. Kneen heard about that from

18   the registrar and sent an e-mail to Mr. Mehta asking whether he

19   was trying to steal Mr. Kneen's registration.  The plaintiff

20   claimed that it was a misunderstanding it had all been a

21   horrible mistake and dropped the transfer request.

22         Eventually, the trademark application began to come to

23   the point of action.  In March of 2015 Mr. Mehta submitted a

24   statement of use to the Patent and Trademark Office.  He there

25   stated under penalties of perjury that he was the owner of the

F77FKNEA

mark Work Better and was using or was of that date using the

mark.  There is no evidence in this record that that is true.

Indeed, the suggestion, to the extent there is any shred of

evidentiary material, is to the contrary but that's for another

day.  The registration issued on May 19 of this year.

Now, the essence of the plaintiff's claim is that

Mr. Kneen has a bad faith intent to profit from the defendant's

trademark; that Mr. Kneen has registered, trafficked in or used

the domain name, that at the time of the registration was

distinctive and that the domain name is identical or

confusingly similar to the mark.  In substance, the argument is

that Mr. Kneen is sitting on the domain name that he registered

almost twenty years ago and that he has a bad faith intention

to profit from the trademark that the plaintiff acquired last

month or the month before, to be precise, by selling it to the

plaintiff, notwithstanding that the overtures from the

plaintiff were ultimately ignored by the defendant.

The plaintiff came into this court on June 29 and

obtained an ex parte temporary restraining order that bars

transfer or otherwise moving the registration of the domain

name from its present registrar which is located in Washington

State.  The order to show cause containing the TRO brought on

this motion which is for a preliminary injunction prohibiting

the domain name from being transferred, reregistered, updated

or moved to a different registrar during the pendency of the

F77FKNEA

1    action.

2           The standard governing the motion is very

3    well-established.  I think everyone knows the test in this

4    circuit.  I'll simply refer to Christian Louboutin S.A. v. Yves

5    St. Laurent American Holding Inc., 696 F3d 206, 215.

6           A sine qua non of a successful application for

7    injunctive relief, including this preliminary injunction, is a

8    showing of a cognizable threat of irreparable injury.  Once

9    upon a time in this circuit irreparable injury was presumed

10   from a likelihood of success on motions for preliminary

11   injunctions in trademark and copyright infringement cases.

12   Perhaps for that reason the plaintiff doesn't even address the

13   issue.  That's a mistake.

14          In Salinger v. Coulting, 607 F.3d 68 at pages 18 to

15   82, the Second Circuit made clear that the Supreme Court's

16   decision in the eBay case effectively had abrogated the sums of

17   irreparable injury and that the district court before issuing a

18   preliminary injunction or a TRO must actually find based on

19   evidence that the plaintiff suffers the requisite likelihood of

20   irreparable injury if a preliminary injunction or a TRO is not

21   issued.

22          Now, there isn't a shred of evidence that Mr. Kneen

23   intends to transfer or move the registration for the

24   WorkBetter.com domain name to a different registrar during the

25   pendency of the litigation.  It has been represented by defense

F77FKNEA

counsel that he couldn't do so if he wanted to.  That rests on

material outside the record and I don't rely on it.  Not that I

question anyone's honesty.  It's simply sufficient that the

plaintiff has the burden of showing a likelihood of irreparable

injury.  A transfer or movement of the registration to a

different registrar is at least one prong of the plaintiff's

argument.  And there's just no evidence that that's likely.

Nor is there any evidence that even if it were likely it would

cause any injury to the plaintiff that would be irreparable.

That's simply a gossamer wing, an imaginary thing.  Nor is

there any evidence that the defendant, according to plaintiff's

claims, intends to reregister or update the registration,

whatever that means, or if defendant did that that there would

be any harm to the plaintiff.  The bottom line rule is I

decline to find that the plaintiff has satisfied its burden of

demonstrating a cognizable threat of irreparable harm if I

didn't issue the preliminary injunction.

          Now, there's plenty more to be said.  I will say some

of it, but certainly not all of it.  The first is that in

assessing a plaintiff's likelihood of success on the merits,

which is a critical ingredient of the showing necessary for

injunctive relief, is a showing where it is controverted that

the plaintiff is likely to prevail on the issue of personal

jurisdiction.  That has not occurred here.  The plaintiff

relies exclusively on Section 302(A)(3)(ii) of the New York

F77FKNEA

1  CPLR.  In relevant part it reads, "As to a cause of action

2  arising from any of the acts enumerated in this section a Court

3  may exercise personal jurisdiction over any non-domiciliary who

4  in person or through an agent commits a tortious act throughout

5  the state causing injury to person or personal property within

6  the state if he expects or should reasonably expect the act to

7  have consequences in the state and derives substantial revenue

8  from interstate or international commerce."  Even assuming for

9  the sake of argument that Mr. Kneen's holding of the

10  registration or his responding to Mr. Mehta's inquiries

11  amounted to a tortious act, of which I have considerable doubt,

12  there is not a shred of evidence that Mr. Kneen expected or

13  reasonably should have expected his actions to have

14  consequences in the State of New York.  There is no evidence

15  that the plaintiff corporation Office Space Solutions Inc. was

16  identified to him.  There is no evidence that either its

17  location or Mr. Mehta's location was made known to him.  For

18  all he knew these inquiries were coming, as I trust humorously

19  said during the argument, from Chechnya or some other

20  inhospitable clime.  Nor is there any evidence that Mr. Kneen

21  derives substantial evidence from interstate or international

22  commerce.  I know there's some general statements that he has

23  done business with people in the United States.  There's

24  evidence of only two trips to the United States over a period

25  of at least two decades.  There's simply no reason on this

F77FKNEA

1  record to conclude that he derives substantial revenue from the

2  interstate or international commerce of the United States.

3          I think Magistrate Judge Cott's decision in

4  Phoenix-Golezal v. Ni, 2012 Westlaw 121105, 2012 is pertinent

5  on the jurisdictional point.  On the record before me on this

6  motion, the plaintiff hasn't got the proverbial hope in

7  someplace I won't mention on the record of prevailing on the

8  jurisdictional point and I must give Mr. Bostany credit for

9  acknowledging that this is absolutely his weakest point.  He

10  has a very correct assessment of that.

11          There's more to be satisfied, though.  There is in my

12  view at least on the record now before me no evidence of a bad

13  faith intent to profit from the plaintiff's May 2015 trademark

14  registration.  The defendant, I find, acted in sublime

15  ignorance of the existence of the intent to use the application

16  throughout the parties' desultory communications and paying his

17  annual renewal fee in 2015.  His refusal in response to one of

18  Mr. Mehta's later communications even to name a price for

19  transferring the domain name is rather inconsistent with the

20  notion that there was an intent to profit, although not

21  entirely so.  There's absolutely no evidence that there's any

22  risk of confusion between anything that the plaintiff might do

23  and the defendant's maintenance of the registration.  There's

24  no evidence at all that though the plaintiff now has a

25  registered mark perhaps only until it's challenged, but he has

F77FKNEA

1    it, that there's any real goodwill associated with the mark,

2    that the mark designates a supplier of goods or services, it's

3    just at the moment pretty much of a fantasy.

4            Now, that's on my rather common sense view of it.  The

5    anticybersquatting act contains a list of nine exhaustive

6    factors to be considered in determining bad faith.  And I

7    reached the same conclusion going through them.  The first

8    factor is the trademark or other intellectual property rights

9    of the defendant, if any, in the domain name.  Well, I don't

10   see any.  That's a point for the plaintiff.

11           The second is the extent to which the domain name

12   consists of the legal name of the person or name commonly used

13   to identify the person.  Well, WorkBetter.com is not the legal

14   name of Mr. Kneen, that's for sure, but he has been using it

15   for fifteen or more years to redirect people who entered that

16   domain name to his personal blog.  I can't exclude the

17   possibility that the domain name in fact is commonly used to

18   identify the person, although that's a rather weak inference

19   and it doesn't really cut very strongly one way or the other.

20           The third factor is the defendant's prior use, if any,

21   of the domain name in connection with offering goods or

22   services.  Well, there's no evidence of that.  Point two for

23   the plaintiff.

24           The fourth factor is the person's bona fide either

25   non-commercial or fair use of the mark in a site accessible

F77FKNEA

under the domain name.  Certainly the use to which it's put now

is non-commercial and of course all of this assumes that

Mr. Kneen knew there was a claim on the trademark, which he

didn't until he got sued.

    The fifth factor and to me this is one of the more

important ones, is the defendant's intent or lack thereof to

divert consumers from the mark owner's online location to a

site accessible under the domain name that could harm the

goodwill represented by the mark either for commercial gain or

disparagement and creating a likelihood of confusion as to

source and so forth.  That is obviously not going on here.  At

least so far as this record discloses.  That's a big point for

the defendant, Mr. Kneen.

    The sixth factor is the person's offer to transfer,

sell or otherwise assign the domain name to the mark owner or

any third party for financial gain without having used the

domain name in the offering of goods or services.  It appears

that Mr. Kneen has marks listed on his website as being for

sale.  He certainly did not rush to sell this one to the

alleged mark owner.  Quite the contrary.

    The seventh factor is the defendant's provision of

material and misleading false contact information in applying

for the registration of the domain name.  No suggestion that

happened.  None at all.  Point for the defendant.

    The eighth factor is the person's registration or

F77FKNEA

acquisition of multiple domain names which the person knows are

identical or confusingly similar to marks of others that are

distinctive at the time of registration, etc.  No evidence that

that's true at all.  Another point for the defendant.

        Finally, the ninth factor is the extent to which the

mark incorporated in the domain name registration either is not

distinctive and famous within the meaning of Subsection C.

There's pretty much no evidence in this record.  Indeed, I

think there is no evidence in this record that anybody ever

heard of the plaintiff's mark except devoted readers of

whatever publications list trademark registrations issued by

the U.S. Patent and Trademark Office.  However you slice it,

there are good cybersquatting cases and there are bad ones.

And this is really one of the bad ones.

        The motion for a preliminary injunction is denied.  I

find no threat of irreparable injury.  I find no likelihood of

success on the merits given the record before me.  The public

interest certainly does not militate in favor of granting

relief.  The balance of hardships in my view, if it cuts in any

direction cuts in favor of Mr. Kneen because an injunction

could threaten to interfere with a perfectly lawful and

appropriate course of business in which he's been engaged since

1999, all at the behest of somebody who appears to have a --

who quite obviously just went out and registered a mark that he

undoubtedly knew was nearly identical to the domain name

F77FKNEA

1   registered and used by the plaintiff for many years for

2   perfectly legitimate reasons.

3           The temporary restraining order is vacated

4   immediately.  And now, Mr. Bostany, I suggest that you might

5   have a conversation with your adversary about withdrawing

6   something.  But the motion is disposed of.  Thank you, folks.

7           (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25